**UNTIED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MICHAEL DYBOWSKI,

      Plaintiff,

                              CASE NO. 2:14-cv-12282

v.

                              HON. MARIANNE O. BATTANI

VCE COMPANY, LLC,

      Defendant.

_____/

**OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This matter is before the Court on Defendant VCE Company, LLC's, Motion for Summary Judgment.  (Doc. 17.)  Plaintiff Michael Dybowski, a former regional sales manager at VCE, has brought the present action alleging that VCE failed to compensate him adequately for his involvement in a particular sale, in breach of the contractual commission plan.  Accordingly, he has stated claims of breach of contract and violation of Michigan's Sales Representative Commission Act.   In its motion for summary judgment, VCE maintains that the contract reserved its right to unilaterally modify the amount of a sales representative's commission in the event of a windfall.  Dybowski disputes this interpretation of the contract and maintains that he was entitled to the full amount of the sales commission.  (Doc. 21.)  For the following reasons, the Court **GRANTS** VCE's Motion for Summary Judgment.

## II.    STATEMENT OF FACTS

VCE, founded in 2009 by EMC, Cisco, and VMware, delivers customized cloud-computing systems through its "vBlock Systems."  VCE manufactures a product called vBlock, which is an integrated computer network infrastructure system that may be customized to VCE client specifications.  In June 2013, VCE hired Dybowski into the Enterprise Sales Group as a regional sales manager to sell vBlock Systems to client prospects in the assigned territory of Michigan.  VCE provided Dybowski a list of client prospects on which he was to focus his sales efforts and additionally assigned him to assist with finalizing a deal with OnStar (the "OnStar Deal") that had been in progress for approximately a year.  Dybowski reported directly to Joseph Vranicar and was expected to log his sales activities for Vranicar's review in order to provide a "forecasting" of potential future sales.

### A.  The Commission Plan and Sales Compensation Terms and Conditions

According to Dybowski's offer letter, his compensation would be comprised of an annual base salary of $135,000 and target "incentive compensation" (viz., sales commissions) of $135,000, prorated to $78,750 because Dybowski began working mid-year.  (Doc. 17, Ex. 4.)  A Goal Acknowledgement Form ("GAF") set his 2013 sales quota at $10,000,000 but likewise prorated it to $7,240,000.  (Doc. 17, Ex. 10.)  The Commission Plan (the "Plan") established the terms and conditions under which Dybowski would earn commissions, including the amount of sales dollars that could be credited toward the sales quota (referred to as "quota credit").  The Plan provides that commission rates are to be determined by dividing the revenue-based commission target by the sales quota.  (Doc. 17, Ex. 11, Part 1 - § 4.4.)  Therefore, given Dybowski's commission target of $78,750 and sales quota of $7,240,000, his base

commission rate was calculated at 0.01087707.  The parties agree that this calculation

is correct.  When Dybowski, for example, made a sale to Beaumont Hospital in the

amount of $487,004, his sales quota was credited in this amount, and he received

$5,297.17 in commission.  Likewise, his sales quota was credited for a sale to General

Motors worth $259,069, on which he received $2,817.91 in commission.

For representatives in the Enterprise Sales Group, commission is paid monthly,

and "100% of the commission is advanced and associated Quota credit allocated upon

booking."  "Booking" occurs upon the receipt of a valid order from a customer.  (Id. at

Part 2 - § 3.1.)  According to the Plan, a sales representative "earns" commission "only

upon collection of the full invoiced amount of the associated order(s)" – any commission

paid out prior to collection is an advance subject to adjustments or chargebacks.  (Id. at

Part 1 - § 4.2.)  The Plan further specifies, "You must be an active VCE employee and

actively working in a sales position by the Terms and Conditions to earn incentive

compensation.  You are not eligible to earn commission or bonuses after your 'Last

Active Date' of employment."  (Id. at Part 1 - § 1.5.)

### B. The Windfall Clause

Part 1, § 6.0 of the Plan, entitled "Special Circumstances," is referred to as the

"windfall clause."  This provision enables the CEO, Senior Vice President, or Vice

President of the company, under special circumstances, to:

> [A]uthorize adjustment of or reduction of commissions or the assignment
> of non-standard commission rates and/or Quota credit.  Such
> circumstances include, but are not limited to, when the total value of a
> deal (may include multiple sales orders or transactions) represents more
> than 50% of your assigned annual Quota (as set forth in your GAF), deals
> at zero field margin or below or any deal that exceeds values established
> by your sales group.  Other special circumstances may include deals that
> require unusual or significant management or corporate involvement,

> deals that are unexpected (including but not limited to deals that aren't
> properly forecasted) and/or are not included in your assigned Quota and
> deals where you had limited involvement or effort.

(Doc. 17, Ex. 11.)  The windfall provision therefore addresses circumstances where a sales representative's quota was set too low, where the representative "walks into" very large sales already in progress, or where a sale was originated or led by one of VCE's parent companies such that the VCE representative played a limited role.  Without adjustments in these situations, a sales representative might receive a commission disproportionate to his or her contribution.  Moreover, under Part 3, § 6.0 of the Plan, VCE reserves the right to "reduce, modify, [or] withhold Plan payments . . . based on a participant's performance, the reversal of previously booked revenue or *VCE determination of special circumstances*, with or without prior notice, and either retroactively or prospectively."  (Id. (emphasis added).)

Adjustments to commissions under the windfall clause are reviewed and authorized by Tim Page, VCE's Global Vice President of Sales.  VCE's finance department automatically flags transactions for Page's review if the value of a sale is greater than 50% of the assigned representative's quota.  When considering sales quota and commission adjustments, Page consults with district vice presidents such as Vranicar for recommendations.

### C.  The OnStar Deal

When Dybowski joined VCE in June 2013, he was assigned to serve as VCE's sales lead on finalizing with OnStar a deal that had been initiated approximately one year previously.  Because OnStar requested to work directly with EMC, VCE's parent company, EMC took the primary role in initiating and closing the transaction.  This

4

meant that EMC sold VCE's product directly to OnStar, and EMC received the revenue of the sale.  Dybowski avers that he took an active role in the deal and was involved in daily meetings with OnStar, EMC, and Cisco representatives.  (Doc. 17, Ex. 3, 51:5-53:8.)  He claims that while initial contact and discussions with OnStar were conducted prior to his hiring, the architecture of the deal took place during his employment.  (Id. at 50:17-18.)  According to Dybowski, EMC and Cisco representatives were "focused on their specific products," while he "was responsible for the total solution."  (Id. at 51:19-21.)  Nonetheless, he concedes that he served in a "support role," as an EMC representative spearheaded the deal.  (Id. at 49:24-50:7.)

In December 2013, several opportunities within the larger OnStar Deal were closed.  According to VCE, the aggregate value of these deals amounted to $16,605,318.  This value exceeded 50% of Dybowski's sales quota, thereby triggering review by Page under the windfall clause.  Page consulted with Vranicar, who recommended that Dybowski be credited with 75% of the sales revenue for the OnStar Deal because EMC won the work and led the transaction and because Dybowski was assigned to the deal after it was well underway.  (Id. at 51:7-53:9.)  Vranicar based his assessment and recommendation on his firsthand knowledge of Dybowski's involvement, as Vranicar himself was involved in the sales transaction.  (Id. at 27:23-28:3, 30:15-22.)  Following Vranicar's recommendation, Page credited Dybowski's sales quota with $11,705,787.69, equivalent to 75% of the total OnStar Deal value.  Multiplied by his base commission rate, Dybowski received $127,324.69 in commission.  The crux of Dybowski's dispute is that he was entitled to commission on the full value of the sale.  Although Dybowski claims that no other VCE employee involved in the OnStar Deal was

subject to a reduction, he cites to no authority other than Vranicar's admission that his own commission was not reduced.  (See Doc. 21, p. 6.)  However, Vranicar was not subject to reduction because the sale did not exceed 50% of his sales quota and therefore did not trigger the windfall clause.

Dybowski also disputes, in particular, the fact that he received no quota credit or commission for the sale referred to as "GM OnStar RES Services."  VCE and Vranicar contend that this was an unexpected deal – that is, Dybowski failed to properly forecast it, and the deal was therefore booked without knowledge of Dybowski's involvment. (Doc. 17, Ex. 1, 118:14-22.)  The windfall clause explicitly authorizes VCE to adjust commission for unforecasted or unexpected deals.  (Doc. 17, Ex. 11, Part 1 - § 6.0.) Accordingly, VCE maintains that Dybowski is not entitled to receive commission from this opportunity.  Dybowski offers no rebuttal against these factual allegations.

### D.  Present Action

Dybowski resigned from his position at VCE on February 28, 2014.  He initiated the present suit in Oakland County Circuit Court on May 6, 2014, and it was removed to this Court on June 10, 2014.  The complaint advances claims for breach of contract and for violation of Michigan's Sales Representative Commission Act ("SRCA").  In his response to VCE's motion, Dybowski claims he was the procuring cause of $20,676,943.17 in sales during his time with VCE.  This value was derived from the total booking value of the OnStar Deal listed on Salesforce.com.  (Doc. 21, Ex. 6.)  While Dybowski claims he was entitled to commissions on this amount totaling $224,905.17, he received only $127,324.69 and presently seeks the difference of $97,580.48.

### III. STANDARD OF REVIEW

6

Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." State Farm Fire & Cas. Co. v. McGowan, 421 F.3d 433, 436 (6th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" Brown v. Scott, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. Anderson, 477 U.S. at 248; McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's

7

pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party.  Anderson, 477 U.S. at 248, 251.

## IV. DISCUSSION

Where, as here, the parties have reduced the terms of their agreement to a written contract, the Court's inquiry must first look to the language of the agreement itself.  See Clark Bros. Sales Co. v. Dana Corp., 77 F. Supp. 2d 837, 843 (E.D. Mich. 1999).  In interpreting the agreement, the Court's primary goal must be to ascertain and honor the intent of the parties.  Rasheed v. Chrysler Corp., 445 Mich. 109, 127 n.28 (Mich. 1994).  Where the parties' intent may be discerned from the clear and unambiguous language of the contract, the terms must be construed in accordance with their plain meaning.  Wright v. DaimlerChrysler Corp., 220 F. Supp.2d 832, 843 (E.D. Mich. 2002).  Where, however, the language is ambiguous, relevant extrinsic evidence of the parties' intent may be considered.  Klapp v. United Ins. Group Agency, Inc., 468 Mich. 459, 471 (Mich. 2003).

According to the plain terms of the windfall clause, VCE reserved the right to review and reduce commissions and quota credit, at its sole discretion, in certain special circumstances.  These circumstances expressly included deals with total values exceeding 50% of the representative's annual sales quota, deals requiring significant corporate involvement, unforecasted deals, and deals in which the representative had limited involvement.  First, the evidence supports the finding that although Vranicar recommended reduction of Dybowski's commission, the final decision was made by Tim Page, the Global Vice President of Sales.  (Doc. 17, Ex. 1, 50:21-22,  Ex. 2 21:16-21.)  Consequently, Dybowski's contention that the decision was not made by a CEO, Senior

Vice President, or Vice President, as required by the Plan, lacks merit.  Second, there can be no question that the value of the OnStar Deal far exceeded 50% of Dybowski's $10,000,000 annual sales quota.  Third, there is no dispute that the OnStar Deal involved significant corporate involvement by parent company EMC.  EMC initiated and spearheaded the transaction, as the client specifically requested to work with EMC. Moreover, the transaction was irrefutably in progress for a significant amount of time prior to Dybowski's entry into the project.  Although Dybowski may have taken an active role in finalizing the deal, his involvement was nonetheless limited to the extent that the deal was led by another company and had been in progress before he joined VCE. Lastly, the unrebutted evidence presented by VCE demonstrates that Dybowski's failure to forecast or report his involvement in the GM OnStar RES Services deal resulted in his failure to receive the associated commission, as permitted by the windfall clause. Accordingly, because all of the special circumstances described in the windfall provision were at play, this case falls squarely within the parameters of the windfall provision.

The windfall provision does not provide any guidelines regarding the exact amount by which commissions may be reduced if the special circumstances exist.  This decision is left to the discretion of VCE's CEO or Vice President.  Such broad discretion may leave the door open for abuse in situations where, for instance, a representative puts in a great deal of effort into acquiring and closing a large deal with a value exceeding half of his annual quota, only to be given 25% of the commission.  However, this is not the case currently at issue.  Under the present circumstances, the Court cannot say that VCE's decision to base Dybowski's commission on 75% of the

aggregate sales value was a patently inequitable abuse of its discretion.  Therefore, VCE's decision to reduce Dybowski's commission was authorized.

Part 2, § 3.1 of the Plan, entitled "Commission Payment & Quota Schedule," regulates when representatives receive commission payment and quota credit. According to the provision, commission is calculated and paid monthly, and "100% of the commission is advanced and associated Quota credit allocated upon booking . . . . The initial allocation of Quota credit is subject to adjustment based on the revenue actually collected for a transaction."  Dybowski appears to interpret this passage as supplanting the windfall clause and requiring that representatives be credited with 100% of an aggregate sale value, subject to adjustment based only on the revenue collected on the order.

Dybowski's interpretation is flawed in several respects.  Section 3.1, as evidenced by its heading, is merely a schedule describing when commission payments are to be made.  It specifies that both commission and quota credit are advanced upon "booking," when an order is received, and not upon "earning," when a client's payment is collected.  (See Doc. 17, Ex. 11, Part 1 - § 4.2.)  According to both Section 3.1 and Part 1, § 4.2 of the Plan, such advances are subject to adjustments and chargebacks should the amount paid be less than the amount expected upon booking.  Section 3.1 does not, as maintained by Dybowski, regulate the amount of commission owed to representatives in the Enterprise Sales Group, as that framework is delineated in Part 1, § 4.0 of the Plan.  Commission is calculated according to Part 1, § 4.0, and Section 3.1 provides that 100% of that amount is to be advanced at the time of booking.  To the extent that Dybowski argues that Part 2 supersedes any conflicting terms set forth in

10

Part 1 (see Part 1, § 1.2.1), Part 2 contains a reaffirmation of the windfall clause as to "all sales groups." (See Doc. 17, Ex. 11, Part 2 - § 1.1.) To adopt Dybowski's interpretation would be to nullify that clause, Part 1, § 4.0, and the windfall clause, thereby violating the basic tenant of contract law that "courts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." See Klapp v. United Ins. Group Agency, Inc., 468 Mich. 459, 468 (2003). The Court's interpretation avoids such an outcome, as all provisions may be given effect. Thus, Dybowski's arguments are unavailing.

The Plan permits VCE to modify the terms and conditions in its sole discretion, provided that VCE issue written notice of modifications and additions to affected employees. (Doc. 17, Ex. 11, Part 1 - § 1.3.) Dybowski maintains that § 1.3 therefore obligated VCE to notify him of the alteration to his commission for the OnStar Deal. Dybowski relies on Trinity Marketing v. Memsic, Inc., No. 12-13967, 2013 U.S. Dist. LEXIS 164918 (E.D. Mich. Nov. 20, 2013), for the proposition that windfall clauses may not be enforced without written notice to the employee. Trinity, however, is distinguishable. The contract at issue there expressly stated that under circumstances such as "windfall or blue bird activity," a change in commission may be required and that that the representative would be issued written notice of the change and would be asked to either accept or reject the proposal. Id. at *14-15. In contrast, the plain terms of the Plan in the present case authorize VCE to alter commissions and quota credit "with or without prior notice, and either retroactively or prospectively." (Doc. 17, Ex. 11, Part 3 - § 6.0.) VCE was thus not obligated to issue written notice of the modification to

Dybowski's commission.  Additionally, this case involves an alteration of the commission consistent with the existing terms and conditions and not a modification of the terms and conditions themselves – Section 1.3 therefore does not apply under the present facts.

In light of the foregoing discussion, VCE's decision to reduce Dybowski's commission was made pursuant to its rights under the Plan, and Dybowski's arguments to the contrary are ultimately without merit.  Consequently, his breach of contract claim must fail.

Finally, the success of an SRCA claim is fully premised on the merits of a breach of contract claim – that is, unless a plaintiff can demonstrate he is owed commissions under a contract, he does not have a viable claim under the SRCA.  Clark Bros., 77 F. Supp. 2d at 852 ("[T]he Michigan Court of Appeals held that the SRCA does not 'create a new obligation or impose a new duty' to pay sales commissions, and that a principal 'who was not liable under the common law is not liable under the SRCA.'") (quoting Flynn v. Flint Coatings, Inc., 230 Mich. App. 633 (1998)).  Because Dybowski's breach of contract claim fails, so must his SRCA claim.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment and **DISMISSES** the case.

**IT IS SO ORDERED.**


Date:      July 24, 2015                              s/Marianne O. Battani
                                                       MARIANNE O. BATTANI
                                                       United States District Judge

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on July 24, 2015.

s/ Kay Doaks
Case Manager